UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Jesus J. Canela,

      Petitioner,

    v.

R.I. GOWER,

      Respondent.

Case No. 15-cv-0398-TEH

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY

    Jesus Canela, a state prisoner, has filed this pro se petition seeking a writ of habeas corpus under 28 U.S.C. § 2254. Respondent was ordered to show cause why the petition should not be granted. Respondent has filed an answer. For the reasons set forth below, the petition is DENIED.

I

    A jury convicted Petitioner of several crimes including second degree robbery, evading a peace officer, and driving in the direction opposite of traffic. People v. Canela, 224 Cal. App. 4th 703, 705 (2014). The jury also found sentencing enhancements for gang involvement and great bodily injury for multiple counts. Id. The trial court granted a motion for a new trial with respect to the gang enhancement for the evading charge. Clerk's Transcript ("CT") at 554-62; Reporter's Transcript ("RT") at 957-59.

1    The California Court of Appeal affirmed the conviction in a

2    partially published opinion.  People v. Canela, 224 Cal. App. 4th

3    703, 705 (2014); Answer, Ex. C.  The California Supreme Court

4    denied a petition for review.  Answer, Ex. F.

5                                    II

6        The following factual background is taken from the order of

7    the California Court of Appeal:[1]

8            The Crimes
             On May 8, 2010, I.B. walked by a parked Buick
9            LeSabre.    A   man—later    identified   as
             appellant—was in the driver's seat.   Another
10           man—later identified as Francisco Chavez—was
             in   the   passenger   seat.    Chavez   asked   to
11           borrow I.B.'s phone; I.B. handed the phone to
             Chavez, who made a call while I.B. walked
12           around to the driver's side of the car.  When
             Chavez finished the call, I.B. asked Chavez
13           to return the phone.  Chavez asked to use the
             phone again and I.B. did not respond.
14
             Chavez   pulled   out   a   gun,   leaned   across
15           appellant, and pointed it at I.B.    Chavez
             told I.B. to give him "whatever" I.B. had.
16           I.B. ran.   Appellant got out of the car and
             chased him, catching him, and grabbing I.B.'s
17           sweat shirt.  I.B. pulled himself free of the
             sweat shirt, leaving it in appellant's hands,
18           and fled.  Without saying anything, appellant
             returned to his car and drove away.    I.B.
19           called the police from a nearby store.

20           Shortly thereafter, Richmond Police Officer
             Byron Macrenato responded to a call from
21           dispatch that a person had been robbed at
             gunpoint and that the robbers' vehicle was a
22           blue, older-model Buick occupied by two
             Hispanic men in their 20's wearing dark-
23           colored tops and hats, and armed with a
             semiautomatic handgun.  Officer Macrenato saw
24           a 90's "blue-purplish Buick occupied by two
             Hispanic males wearing black shirts and black
25           hats."   The car was preparing to turn left.
             Officer Macrenato made eye contact with
26           appellant, who looked in Officer Macrenato's

27

28   ─────────────────
     [1] This summary is presumed correct.  Hernandez v. Small, 282 F.3d
     1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

                                      2

direction and continued northbound instead of turning. Officer Macrenato followed the vehicle without activating his lights and sirens and called for backup.

Shortly thereafter, two other Richmond police officers, Phil Sanchez and Ian Reid, arrived in separate patrol cars with their lights and sirens activated. At that point, appellant "immediately took off at a high rate of speed," and the three officers followed with their lights and sirens activated. Appellant drove "at least 40 miles an hour" in a 25 mile per hour zone. Appellant ran a stop sign, turned left, and ran three red lights. Then he made a left turn through a red light without slowing down and hit pedestrian M. Broadway, who was pushing a shopping cart. The force of the collision knocked Broadway about 25 feet into a parking lot, and sent some of his possessions flying. The impact was so strong that Broadway "went airborne" like a rag doll tossed into the air. Broadway—who was lapsing in and out of consciousness, and who appeared to have severe head and leg injuries—was taken to the hospital, where he underwent surgery for a spinal fracture.

Appellant's car skidded. The rear wheels landed on the sidewalk and the rear windshield shattered. Appellant drove back onto the street and slowed down; Chavez jumped out of the car and ran. Officers Macrenato and Reid followed appellant, who continued to speed, made several more turns, and ran two stop signs. Appellant also drove for some distance in the wrong direction and into oncoming traffic before running another red light and turning left. After several more blocks, appellant jumped out of his car and ran. Officer Macrenato pursued appellant on foot, pulled out his gun, and ordered appellant to stop. Appellant did not comply. Eventually, Officers Reid and Macrenato subdued and arrested appellant, who was "kicking and kicking." Law enforcement officers found I.B.'s sweatshirt and phone in appellant's car.

Ex. C. at 2-3.

III

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

4

1      "[A] federal habeas court may not issue the writ simply
2  because that court concludes in its independent judgment that the
3  relevant state-court decision applied clearly established federal
4  law erroneously or incorrectly.  Rather, that application must
5  also be unreasonable."  Id. at 411.  A federal habeas court
6  making the "unreasonable application" inquiry should ask whether
7  the state court's application of clearly established federal law
8  was "objectively unreasonable."  Id. at 409.  Moreover, in
9  conducting its analysis, the federal court must presume the
10 correctness of the state court's factual findings, and the
11 petitioner bears the burden of rebutting that presumption by
12 clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the
13 Court explained: "[o]n federal habeas review, AEDPA 'imposes a
14 highly deferential standard for evaluating state-court rulings'
15 and 'demands that state-court decisions be given the benefit of
16 the doubt.'"  Felkner v. Jackson, 562 U.S. 594, 598 (2011).
17     Section 2254(d)(1) restricts the source of clearly
18 established law to the Supreme Court's jurisprudence.  "[C]learly
19 established Federal law, as determined by the Supreme Court of
20 the United States" refers to "the holdings, as opposed to the
21 dicta, of [the Supreme] Court's decisions as of the time of the
22 relevant state-court decision."  Williams, 529 U.S. at 412.  "A
23 federal court may not overrule a state court for simply holding a
24 view different from its own, when the precedent from [the Supreme
25 Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S.
26 12, 17 (2003).
27
28

1    When applying these standards, the federal court should

2   review the "last reasoned decision" by the state courts.  See

3   Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991); Barker v. Fleming,

4   423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no

5   reasoned opinion from the state's highest court, the court "looks

6   through" to the last reasoned opinion.  See Ylst, 501 U.S. at

7   804.

8    With these principles in mind regarding the standard and

9   scope of review on federal habeas, the Court addresses

10  Petitioner's claims.  Petitioner alleges that: (1) the trial

11  court erroneously denied his motion that the prosecutor unfairly

12  excluded jurors based on race, in violation of Batson v.

13  Kentucky, 476 U.S. 79 (1986); (2) there was insufficient evidence

14  to support a gang enhancement; and (3) there was insufficient

15  evidence to support a true finding that Petitioner personally

16  inflicted great bodily injury while evading a police officer.

17                                 IV

18                                 A

19    Petitioner first contends that the trial court erred in

20  denying the Wheeler/Batson[2] motion.  Petitioner is a Hispanic male

21  and alleges that the prosecutor improperly excused an African

22  American juror, Ms. N.  The California Court of Appeal set forth

23  the relevant background for this claim:

24          After filling out standard jury and gang
            questionnaires, the court and counsel voir
25          dired prospective jurors.  The juror who was
            the subject of appellant's Batson/Wheeler
26          motion provided the following information and

27  _____

28  [2] The California counterpart to Batson is People v. Wheeler, 22
    Cal. 3d 258 (1978).

United States District Court
Northern District of California

6

was questioned by the court and the prosecutor as follows:

> In her standard and gang questionnaires, Ms. N. indicated she is single and has no children. She lives in Richmond and works for the Social Security Administration in Richmond. She did not date her gang questionnaire. She checked or answered "no" to every box on the questionnaires, and she wrote no narrative responses to any of the questions. When questioned by the court, Ms. N. provided one-word answers. The prosecutor questioned Ms. N. because she responded "no" to the question asking whether she had seen, read, or heard news coverage of cases involving gang activity. In response, Ms. N. admitted she had "heard" about gangs but did not "pay much attention to it." She denied witnessing gang violence or being a crime victim. She stated she could be fair and impartial.

> After the prosecutor used peremptory challenges to excuse three African-American jurors, including Ms. N., defense counsel made a <u>Batson/Wheeler</u> motion, arguing: "I do not believe that there was any — any proper reason to dismiss Ms. N[.] She said very unequivocally that she could be fair and impartial, had no knowledge about gangs, no gang concerns. There was nothing indicating that she would be anything but fair and impartial. [¶] And I don't believe that . . . [the prosecutor] followed up to try to pursue any valid reasons as to why she could not be fair and impartial in this case. [¶] Ms. N[.] is an African-American juror, I presume. . . . I don't believe there was anything elicited as to Ms. N[.] as to any reason why she could not be fair and impartial."

> When the court asked the prosecutor to "respond to the prima facie issue," she stated, "I don't believe there's been prima facie case. . . . [¶] I hear [defense counsel']s argument that [Ms. N.] didn't say anything wrong that would justify it, but the problem is and the reason why I had no comfort level with her, is she didn't say anything at all. She sticks out like a blinking red flag because her entire standard questionnaire is marked no, and her entire gang questionnaire is marked no on everything. She doesn't have any feelings

about gangs.  And then she denied ever
hearing any gang coverage news at all, which
I think is implausible, so that's the one
question I asked her.  And then she admitted
that she had heard some.  But she just didn't
seem responsive and forthcoming."

The prosecutor explained she "look[ed] for .
. . jurors with a stake in the community, an
interest in the community, an interest in
having crime off the street.  [¶]  And
specifically I prefer married jurors with
children.  [Ms. N is] single and has no
children.  And just her demeanor seems like —
she works for Social Security, so my thought
process is she's probably getting paid to be
here and would like to be on the jury, and
isn't giving us anything at all to work with.
She didn't date her questionnaire and just
simply circled no to every single thing,
which I found suspicious.  [¶]  Now, if I had
already used nine challenges and Ms. N[.] was
on the panel, then, okay, but the rest of the
jurors in the box look pretty good to me
right now, so I had the luxury of having a
challenge available for a juror that was
outside my comfort level."

In response, defense counsel argued: "Well,
nonverbal cues, which it seems like [the
prosecutor] is alluding to, ha[ve]
specifically been held to be . . . an
insufficient . . . basis to kick off a juror.
. . . [¶] And there were also other jurors
where they also answered no on every
questionnaire and they have not been kicked
off.  So I don't — I don't believe that that
is a valid basis to kick Ms. N[.] off."  The
prosecutor disagreed, stating, "I don't think
there's anybody else who did a straight no,
with no feelings about gang and no input as
to anything in all 85 — or the portion of the
85 who did the questionnaires."

The court denied the Batson/Wheeler motion.
It explained, "I do think that [defense
counsel] has made a prima facie case, at
least.  There were only three African-
American jurors in the first 21. . . .  They
are a cognizable group.  And exercising three
out of four challenges to date as to African-
American Americans, I think, does raise a
prima facie case. [¶] So that then puts the
issue of whether there is justification for
the challenges.  And the — although I do have
some concerns about — about this, I think

8

1

> that [the prosecutor] has expressed
> legitimate bases in the record for the
> exercise of this challenge."

2

> The court continued, "[m]y own note[ ] on Ms.
> N[.] is that she's not forthcoming.  I wrote
> that down at the time.  And her affect, I
> think — I had the same sense from [the
> prosecutor] that her affect was of
> disengagement.  So I understand what [the
> prosecutor] is talking about and, you know,
> at the time I wrote 'not forthcoming.' . . .
> [¶] So although I understand [defense
> counsel's] concern, and just simply based on
> numbers, I think that there's a basis for
> that concern and, therefore, a prima facie
> case being made, I think [the prosecutor's]
> explanations for the reasons that she
> challenged Ms. N[.] are in good-faith based
> on the record for nonracial — based on
> nonracial criteria.  And so for that reason
> I'm going to deny the Wheeler/Batson motion."

3

4

5

6

7

8

9

10

11

12    Ex. C at 5-7.

13         The use of peremptory challenges by either the prosecution

14    or defense to exclude cognizable groups from a jury may violate

15    the Equal Protection Clause.  See Georgia v. McCollum, 505 U.S.

16    42, 55-56 (1992).  The Supreme Court has held that the Equal

17    Protection Clause forbids the challenging of potential jurors

18    solely on account of their race.  See Batson v. Kentucky, 476

19    U.S. 79, 89 (1986).  Batson permits prompt rulings on objections

20    to peremptory challenges under a three-step process:

21         First, the defendant must make out a prima facie case that

22    the prosecutor exercised peremptory challenges on the basis of

23    race "by showing that the totality of the relevant facts gives

24    rise to an inference of discriminatory purpose."  Batson, 476

25    U.S. at 93-94.

26         Second, if the requisite showing has been made, the burden

27    shifts to the prosecutor to articulate a race-neutral explanation

28    for striking the jurors in question.  Id. at 97; Wade v. Terhune,

United States District Court
Northern District of California

202 F.3d 1190, 1195 (9th Cir. 2000).

Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  <u>Batson</u>, 476 U.S. at 98; <u>Wade</u>, 202 F.3d at 1195. To fulfill its duty, "the trial court must evaluate the prosecutor's proffered reasons and credibility under 'the totality of the relevant facts,' using all the available tools including its own observations and the assistance of counsel." <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1047 (9th Cir. 2004); <u>Lewis v. Lewis</u>, 321 F.3d 824, 831 (9th Cir. 2003).  "As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis . . .," particularly when the state court declined to do so.  <u>Jamerson v. Runnels</u>, 713 F.3d 1218, 1224 (9th Cir. 2013).  Then the court should "reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine."  <u>Id</u>. at 1225.

In evaluating the race neutrality explanation, the court must keep in mind that proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. <u>See Hernandez v. New York</u>, 500 U.S. 352, 355-62 (1991) (no discriminatory intent where Latino jurors dismissed because of possible difficulty in accepting translator's rendition of Spanish language testimony).  It should also keep in mind that a finding of discriminatory intent turns largely on the trial court's evaluation of the prosecutor's credibility.  <u>See Rice v.</u>

United States District Court
Northern District of California

Collins, 546 U.S. 333, 340-41 (2006); Lewis, 321 F.3d at 830. Because determinations of credibility and demeanor of the prosecutor and jurors lie "peculiarly within [the] trial judge's province," the trial court's ruling on the issue of discriminatory intent is entitled to great deference and must be sustained unless clearly erroneous. Snyder v. Louisiana, 552 U.S. 472, 476-82 (2008) (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)); see Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011) (per curiam) (reversing Ninth Circuit's "inexplicable" and "unexplained" finding that proffered race-neutral explanations for peremptory strikes were insufficient to outweigh evidence of purposeful discrimination).

The California Court of Appeal discussed the relevant state law and denied this claim after also conducting a comparative juror analysis:

> Here, appellant contends "the prosecutor's asserted reasons for striking Ms. N. do not withstand scrutiny. Nor, for that matter, does the court's finding." We disagree. As our high court has explained, "'[t]he proper focus of a Batson/Wheeler inquiry . . . is on the subjective genuineness of the race-neutral reasons given for the peremptory challenge, not on the objective reasonableness of those reasons.' [Citation.] '"[E]ven a 'trivial' reason, if genuine and neutral, will suffice."' [Citation.]" (Jones, supra, 57 Cal. 4th at p. 917.)
>
> Here, the prosecutor offered several reasons why she excused Ms. N.: (1) she stuck "out like a blinking red flag" because she did not date one of her questionnaires and "marked no" on her "entire standard questionnaire" and her "entire gang questionnaire[;]" (2) her denial of having heard gang news coverage on her questionnaire seemed implausible and she was not responsive and forthcoming when questioned about it on voir dire; and (3) her

11

single and childless status suggested she did not have a "stake in the community" or an "interest in having crime off the street."

Numerous cases have held these reasons are legitimate race-neutral reasons for exercising peremptory challenges. (See People v. Battle (2011) 198 Cal. App. 4th 50, 61 [juror's lack of interest in a case proper basis for exercising peremptory challenge]; Jones, supra, 57 Cal. 4th at p. 917 ["[a] prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons"]; People v. Booker (2011) 51 Cal. 4th 141, 166 [court properly denied defendant's motion "with respect to J.M. because of his less than forthcoming responses on the juror questionnaire and during voir dire"]; People v. Perez (1994) 29 Cal. App. 4th 1313, 1328 [marital status and lack of life experience].) The prosecutor's reasons for excusing Ms. N. "were neither inherently implausible nor affirmatively contradicted by anything in the record." (People v. Reynoso (2003) 31 Cal. 4th 903, 926.)

We are not persuaded by appellant's reliance on People v. Long (2010) 189 Cal. App. 4th 826 (Long). In Long, the reporter's transcript revealed one of the prosecutor's reasons for using a peremptory challenge was "demonstrably false" and that the prosecutor excused a prospective juror based on "his 'body language'" without providing specific examples. (Id. at pp. 843, 847.) Here and in contrast to Long, both the court and the prosecutor believed Ms. N. was reticent when answering questions. Unlike Long, there is no indication any of the prosecutor's reasons for excusing Ms. N. were "demonstrably false." Finally, the prosecutor here gave specific examples of Ms. N.'s reluctance to answer questions. "[N]othing in Wheeler disallows reliance on the prospective jurors' . . . manner of answering questions as a basis for rebutting a prima facie case. . . ." (People v. Fuentes (1991) 54 Cal. 3d 707, 715.)

Appellant contends a comparative analysis demonstrates the prosecutor acted with discriminatory intent. "[C]omparative juror analysis must be considered for the first time on appeal while reviewing third stage

12

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Batson/Wheeler claims when a defendant relies on such evidence and the record is adequate to permit the comparisons. [Citation.]" (People v. Williams (2013) 56 Cal.4th 630, 662.) Our high court has, however, "warned of the inherent limitations of such evidence. 'On appellate review, a voir dire answer sits on a page of transcript. In the trial court, however, advocates and trial judges watch and listen as the answer is delivered. Myriad subtle nuances may shape it, including attitude, attention, interest, body language, facial expression and eye contact.' [Citation.] 'A transcript will show that the panelists gave similar answers: it cannot convey the different ways in which those answers were given. Yet those differences may legitimately impact the prosecutor's decision to strike or retain the prospective juror.' [Citation.]" (Id. at p. 662.)

Appellant contends the prosecutor excused Ms. N. because she is "single with no children" but was "not consistent in striking jurors based on either marital status, or parenthood." According to appellant, the prosecutor stated she "preferred" married jurors with children but "kept" several other jurors on the jury — Juror Nos. 1 and 3 — who did not meet that criteria.   FN6 Appellant's use of comparative juror analysis does not persuade us the court erred in denying his Batson/Wheeler motion. "While an advocate may be concerned about a particular answer, another answer may provide a reason to have greater confidence in the overall thinking and experience of the panelist. Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so." (People v. Lenix (2008) 44 Cal. 4th 602, 631, fn. omitted.)

> FN6 Appellant also notes the prosecutor allowed Juror No. 5, who was single with a child, and Juror Nos. 6 and 7, who were married but childless, to remain on the jury. These jurors are different from Ms. N. and, in any event, they provided narrative responses to the jury questionnaire and were forthcoming during voir dire.

Juror No. 1 was single with no children, but she had previously served on a jury in a criminal case that reached a verdict, had

United States District Court
Northern District of California

family members and friends who worked in law enforcement, and had been a victim of a gang crime.  In addition, Juror No. 1 was engaged, responsive, and forthcoming during voir dire.  Juror No. 3 was similarly single and childless but provided narrative responses on the jury questionnaire, had "seen neighborhoods ruined by gang activity[,]" and was "fearful" when living near public housing and witnessing gang activity.  In contrast to Ms. N., Juror Nos. 1 and 3 were forthcoming and gave answers during voir dire indicating they held a favorable view of law enforcement and had a stake in the community.

Next, appellant argues the prosecutor's claim that she struck Ms. N. "because she works for the Social Security Administration and was 'probably getting paid to be here and would like to be on the jury'" was pretextual because Juror No. 2 also worked for the Social Security Administration.  Appellant misconstrues the prosecutor's remarks.  The prosecutor did not challenge Ms. N. because of where she worked; she challenged Ms. N. because she believed Ms. N. was not an ideal juror based on her demeanor, her lack of engagement during voir dire, and the prosecutor's belief that Ms. N lacked a stake in the community.  Moreover, and in contrast with Ms. N., Juror No. 2 wrote narrative answers on the jury questionnaire, was talkative during voir dire, had prior jury experience, was married with children, and had family in law enforcement.

We conclude appellant's comparative analysis claim fails.  Substantial evidence supports the denial of appellant's <u>Batson</u>/<u>Wheeler</u> motion.

Ex. C at 8-11 (footnote omitted).

In this case, both the trial court and the California Court of Appeal reached the third <u>Batson</u> step and discussed the prosecution's reasons for striking these jurors and engaged in a comparative juror analysis.  RT at 119-20; Ex. C at 9-11. Petitioner does not argue that the state courts used an improper legal standard.  Therefore, the California Court of Appeal

14

opinion is entitled to AEDPA deference.  See Johnson v. Finn, 665 F.3d 1063, 1068-69 (9th Cir. 2011); see also Briggs v. Grounds, 682 F.3d 1165, 1171 n.6 (9th Cir. 2012) ("Where the state court conducted comparative analysis and determined that the prosecutor did not exercise her peremptory challenges in a discriminatory manner, AEDPA deference applies and we need not undertake comparative analysis de novo.").

Petitioner has failed to show that the state court denial of this claim was objectively unreasonable.  Juror Ms. N. was one of only two jurors who did not provide any information in the juror questionnaire other than marking 'no'.  Supp. CT at 119-22, 136-39.  Ms. N. answered that she had not seen, read, or heard any news coverage regarding cases involving gang activity.  Supp. CT at 121.  The prosecutor thought that was implausible and when she specifically questioned Ms. N., the juror responded that she had in fact heard about gang violence in the news.  Augmented ("Aug.") RT at 136-37.

At the hearing in the trial court, the prosecutor argued that Ms. N. marking 'no' for every question on the questionnaire and providing no narrative answers were red flags.  The prosecutor stated that she preferred jurors who had a stake in the community and that Ms. N.'s answers did not reflect that she had such a stake.  The prosecutor also preferred married jurors with children.  These are race-neutral reasons, and Petitioner has not shown that the prosecutor's explanations were pretextual. The only other juror to just answer 'no' on the questionnaire and provide no detailed answers was Juror No. 32 who was also dismissed by the prosecutor.  Juror No. 32's race is not known,

United States District Court
Northern District of California

but she was not African-American.  The trial court and Petitioner's counsel noted the previously struck African-American jurors,[3] and that did not include Juror No. 32.  RT at 115-16.

In addition to the prosecutor's reasons being race-neutral, the trial court independently had the same reservations about Ms. N.  The trial court noted that Ms. N. was not forthcoming and her affect was of disengagement.  RT at 119-20.

Nor has Petitioner shown that the comparative juror analysis conducted by the California Court of Appeal was unreasonable. Petitioner argued that other single jurors with no children were allowed to serve on the jury, and these jurors were not African-American.  However, these other single jurors were not similarly situated to Ms. N.  Juror No. 1 had previously served on a jury for a criminal case, had been the victim of a gang crime, and had friends who worked in law enforcement.  It was reasonable for the prosecutor to want a juror who was the victim of gang crime on this case with gang allegations, even if that juror was single and childless.  Juror No. 3 was also single and childless, but noted in the questionnaire he or she had seen neighborhoods ruined by gang activity and was fearful when living near public housing and witnessing gang activity.  Petitioner has not shown discriminatory intent by the prosecutor; rather, these single and childless jurors were forthcoming in their answers on the questionnaire, and had stakes in the community, and had concerns about gang violence, as opposed to Ms. N.

---

[3] The Batson/Wheeler motion in the trial court, the petition to the California Supreme Court and this federal petition only involved Ms. N.  RT at 115-16; Ex. H at 25-32; Petition at 6, 64-72.

United States District Court
Northern District of California

The prosecutor also noted that Ms. N. worked for the Social Security Administration and was probably getting paid to be at court and would like to be on the jury. Petitioner argues this reason was pretextual because Juror No. 2 worked for the Social Security Administration and served on the jury. The state court noted that these jurors were not similar because Juror No. 2 wrote narrative answers on the questionnaire, was talkative during voir dire, had prior jury experience, was married with children, and had family in law enforcement. The California Court of Appeal did not find these two jurors similarly situated to demonstrate discriminatory intent in the peremptory challenge to Ms. N. This conclusion was not unreasonable.

Finally, as noted above, the only other juror who also answered 'no' to all questions on the questionnaire was excused by the prosecutor, and the juror was not African-American. Petitioner has failed to show that the California Court of Appeal was objectively unreasonable, and a review of the record does not indicate purposeful discrimination; rather, the prosecutor expressed proper race neutral explanations that were supported by the trial court's independent observations. This claim is denied.

**B**

Petitioner next argues that there was insufficient evidence to support a gang enhancement for second degree robbery for the benefit of, at the direction of, or in association with a criminal street gang (Cal. Penal Code § 186.22(b)(1)). The California Court of Appeal set forth the relevant background for this claim:

17

Richmond Police Detective Daniel Reina testified as an expert on Richmond criminal street gangs. Reina described the history, culture, and violent character of the Sureño gang, which has several subsets in Richmond. Sureños are spread throughout Richmond, and a majority of the city is Sureño territory. Most homicides and narcotics offenses in Richmond are gang related. The Sureños' "primary activities . . . include homicides, assaults, robberies, stolen vehicles, . . . vandalisms [and] . . . weapons offenses[.]"

The Sureño gang is highly structured, and its core values are pride and respect. Many Sureño gang subsets incorporate the term "loco" — meaning "crazy" — to show their members will do anything. To become a Sureño, a new member is typically "jumped in," undergoing a physical assault to prove loyalty, willingness to take a beating for the gang, and to show he will stand his ground if attacked. A Sureño must remain active in the gang and commit crimes: committing crimes allows members to remain in good standing, to gain respect, and to enhance their reputation within the gang. It is very important for a Sureño to appear tough to other Sureños and to rival gang members because it permits the gang to retain control over its territory and to instill fear in the community. Sureños typically wear blue and black clothing and get tattoos to show they are associated with the gang. They associate with the letter M, and the numbers 13 and 3. Sureños use graffiti to mark the gang's territory, advertise the gang, and to intimidate and instill fear in the community. Gang members tend to carry guns and to be uncooperative with the police to show they are not afraid.

The prosecution introduced evidence of three crimes committed by appellant and Chavez as members of the Sureño gang. In an October 2007 incident, appellant and another Sureño, Aguilar, threatened the victim, smashed his car window, and Aguilar shot the victim's car tire. Appellant "terrorized the victim." Gang signs "played a significant role" in the terrorization and "were being thrown at the time of the incident." FN5 Appellant was convicted of assault, criminal threats, and

18

being a felon in possession of a firearm.   In November 2007, appellant was convicted of vehicle theft after a police officer saw him "driving a stolen vehicle" and arrested him. In the third offense, in October 2009, Chavez was convicted of various crimes, including auto theft, possession of stolen property, and possession of a deadly weapon.

> FN5  Appellant was not present when Aguilar shot the car tire.  The police report did not indicate the incident was gang related.

Reina opined Chavez is a Sureño because he associates with other Sureños, has common Sureño tattoos, and because he admitted "to being a Sureño while being housed in jail." Reina also opined appellant was a Sureño at the time of the October and November 2007 offenses.   Shortly before the May 2010 robbery of I.B., appellant told Reina he was a member of the Sureño gang.   After his arrest, appellant told jail personnel "[a]t least half a dozen" times that he is a Sureño.   Appellant has Sureño tattoos on his hand and elbow.

The prosecutor posed a hypothetical where two Sureño gang members commit a street robbery where "two Sureños together approach a person in the street and ask to use the cell phone, and this person initially agrees, but then when he asks for his cell phone back, one Sureño says, No, brandishes a gun, and then says, This is a robbery, give me what you've got, maybe not verbatim, but communicates it's a robbery, at which point the victim runs.   And the other Sureño, without the gun, chases down that victim and pulls his sweatshirt off and then leaves with the sweatshirt and the cell phone."   Based on this hypothetical, Reina opined the crimes were "definitely done" for the benefit of, or in association with, the Sureño gang, even if the victim did not know the men were gang members and even if the item stolen was of little value. Reina explained, "you have two Sureños . . . committing a robbery. [¶] Second, it benefits the gang in the fact that whether this person is just a normal citizen in the community, the fear and intimidation factor is there.   He is asked to borrow a cell phone.   Then when the citizen asks for his cell phone back, he's denied it. . . . That right there is kind of an intimidation

19

1

> factor.   Even   more   so   when   a   firearm   is
> presented[.]"

2

3

> As   Reina   explained,   committing   a   street
> robbery   and   evading   the   police   elevates   a
> gang   member's   status   in   the   eyes   of   the   gang.

4

> On   cross-examination,   Reina   agreed   it   would
> bolster   his   opinion   that   the   offenses   were

5

> committed   for   the   gang's   benefit   if   appellant
> or   Chavez   had   worn   gang   colors,   used   gang

6

> slogans,   or   flashed   gang   signs,   if   the   gang
> had   taken   credit   for   the   crimes,   or   if   the

7

> victim   was   rival   gang   member.   Reina
> concluded,   however,   that   the   lack   of   these

8

> additional   factors   did   not   change   his   opinion
> that   the   robbery   was   committed   for   the

9

> benefit   of,   or   in   association   with,   the
> Sureño   street   gang.

10

Ex. C at 11-13.

11

   The Due Process Clause "protects the accused against

12

conviction except upon proof beyond a reasonable doubt of every

13

fact necessary to constitute the crime with which he is charged."

14

In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who

15

alleges that the evidence in support of his state conviction

16

cannot be fairly characterized as sufficient to have led a

17

rational trier of fact to find guilt beyond a reasonable doubt

18

therefore states a constitutional claim, see Jackson v. Virginia,

19

443 U.S. 307, 321 (1979), which, if proven, entitles him to

20

federal habeas relief, see id. at 324.

21

   The Supreme Court has emphasized that "Jackson claims face a

22

high bar in federal habeas proceedings . . . ."  Coleman v.

23

Johnson, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding

24

that the Third Circuit "unduly impinged on the jury's role as

25

factfinder" and failed to apply the deferential standard of

26

Jackson when it engaged in "fine-grained factual parsing" to find

27

that the evidence was insufficient to support petitioner's

28

conviction).  A federal court reviewing collaterally a state

United States District Court
Northern District of California

20

court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  <u>Payne v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  <u>Payne</u>, 982 F.2d at 338 (quoting <u>Jackson</u>, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt has there been a due process violation.  <u>Jackson</u>, 443 U.S. at 324; <u>Payne</u>, 982 F.2d at 338.

The California Court of Appeal denied this claim after citing relevant state law:

> Appellant challenges only the first element of the enhancement: that the robbery was committed "for the benefit of, at the direction of, or in association with any criminal street gang . . . ." (§ 186.22, subd. (b)(1); <u>People v. Albillar</u> (2010) 51 Cal. 4th 47, 61, 63-64 (<u>Albillar</u>).)
>
> . . .
>
> Appellant is correct that "[n]ot every crime committed by gang members is related to a gang." (<u>Albillar</u>, <u>supra</u>, 51 Cal. 4th at p. 60.)  Here, however, there is substantial evidence the robbery was committed "for the benefit of" the Sureño gang.  (§ 186.22, subd. (b)(1).)  <u>Albillar</u> is instructive.  There, the prosecution expert testified "that '[w]hen three gang members go out and commit a violent brutal attack on a victim, that's elevating their individual status, and they're receiving a benefit.  They're putting notches in their reputation.  When these members are doing that, the overall entity benefits and strengthens as a result of that.'  Reports of such conduct 'rais[e] the[ ] level of fear and intimidation in the community.'  [The expert] then applied his analysis to a hypothetical based on the facts of the crime

United States District Court
Northern District of California

. . . where the victim knew that at least two of her assailants were members of Southside Chiques. 'More than likely this crime is reported as not three individual named Defendants conducting a rape, but members of [Southside] Chiques conducting a rape, and that goes out in the community by way of mainstream media or by way of word of mouth.
That is elevating [Southside] Chiques' reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity.'" (<u>Albillar</u>, <u>supra</u>, 51 Cal. 4th at p. 63.)

. . .

That appellant and Chavez did not wear gang clothing does not alter our conclusion. Reina testified it was more common for younger gang members to wear gang colors whereas for "the older" gang members "it's not as significant." Additionally, while I.B. did not notice appellant and Chavez's tattoos, there was evidence each had gang tattoos in visible places, on their hands. And while there was no evidence appellant or Chavez threw gang signs or bragged about the robbery, Reina testified the commission of violent crime in gang territory benefited the gang, as evidenced in the level of comfort with which the two men robbed I.B. at gunpoint in broad daylight.

In addition, there was substantial evidence the offenses were committed "in association" with a gang. (§ 186.22, subd. (b)(1).) <u>Albillar</u> is on point. There, our high court determined there was substantial evidence the "defendants came together as gang members to attack [the victim] and, thus, that they committed these crimes in association with the gang." (<u>Albillar</u>, <u>supra</u>, 51 Cal. 4th at p. 62.) As the <u>Albillar</u> court explained, the "defendants' conduct exceeded that which was necessary to establish that the offenses were committed in concert. Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police, and on the gang's reputation to ensure that the victim did not

United States District Court
Northern District of California

1

> contact the police." (Id. at pp. 61-62.)
>
> As in Albillar, Chavez and appellant acted together. They approached I.B. and — when he did not comply with Chavez's demand for the phone — Chavez pointed a gun at him and appellant chased him. When appellant and Chavez fled from the police, appellant slowed the car down so Chavez could escape. In addition, appellant and Chavez — both admitted Sureños — had previously committed crimes together. The evidence supports the jury's finding that appellant and Chavez "came together as gang members" to rob I.B. in association with the Sureño gang. (Albillar, supra, 51 Cal.4th at pp. 62-63.) We conclude substantial evidence supports the jury's true finding on the gang enhancement in Count 1.

Ex. C at 14-17.

   The Jackson standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; see, e.g., Boyer v. Belleque, 659 F.3d 957, 968 (9th Cir. 2011) (concluding it was not unreasonable, in light of Oregon case law, for Oregon court to conclude that a rational jury could find beyond a reasonable doubt that petitioner intended to kill his victim based on proof that he anally penetrated several victims with knowledge that he could infect them with AIDS). The state court's ruling on the state law issue is binding on this Court.

   However, "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law," Coleman, 132 S. Ct. at 2064, yet, Petitioner has not shown that the state court was objectively unreasonable in finding sufficient evidence to support the enhancement in light of the high bar for Jackson claims. Nor has he demonstrated an unreasonable determination of the facts.

United States District Court
Northern District of California

United States District Court
Northern District of California

Petitioner argues that he was a gang member who committed a crime but not every crime committed by a gang member is related to the gang.  Yet, the gang expert testified to various ways in which the robbery was committed for the benefit of, at the direction, or in association with a street gang.  While the evidence was not overwhelming, viewing it in the light most favorable to the prosecution, the jury could have found the essential elements of the enhancement beyond a reasonable doubt.  Petitioner has failed to meet the high threshold of a sufficiency of the evidence claim and he is not entitled to habeas relief.  This claim is denied.

C

Petitioner next asserts that there was insufficient evidence to support a true finding that he personally inflicted great bodily injury while evading a police officer and driving in the opposite direction of traffic.

Petitioner was found guilty of violating California Vehicle Code section 2800.4, and it was found that he personally inflicted great bodily injury while committing the offense pursuant to section 12022.7(a) of the state penal code.

Vehicle Code section 2800.4 provides in relevant part, "Whenever a person willfully flees or attempts to elude a pursuing peace officer in violation of [Vehicle Code] [s]ection 2800.1, and the person operating the pursued vehicle willfully drives that vehicle on a highway in a direction opposite to that in which the traffic lawfully moves upon that highway," the

1   person may be punished by imprisonment in county jail or prison.[4]

2       Petitioner argues that the great bodily injury enhancement

3   must be stricken because he struck the victim with his car before

4   he drove in the opposite direction of traffic.  Petitioner

5   contends that the crime outlined in Vehicle Code section 2800.4

6   does not commence until the defendant drives in the opposite

7   direction of traffic.

8       The California Court of Appeal denied this claim:

9           Because section 12022.7 "is dependent upon
            and necessarily attached to its underlying
10          felony" (People v. Mustafaa (1994) 22 Cal.
            App. 4th 1305, 1311, 28 Cal. Rptr. 2d 172)
11          the question is whether appellant was engaged
            "in the commission of a felony or attempted
12          felony" when he caused Broadway's injuries.
            (§ 12022.7, subd. (a).)  The answer is yes.
13
            First, we "examine the statutory language,
14          giving it a plain and commonsense meaning."
            (People v. Fandinola (2013) 221 Cal. App. 4th
15          1415, 1421, 165 Cal. Rptr. 3d 383.)  Vehicle
            Code section 2800.4 provides that "[w
16          ]heneverr a person willfully flees or
            attempts to elude a pursuing peace officer in
17          violation of [Vehicle Code] [s]ection 2800.1"
            and "drives that vehicle on a highway in a
18          direction opposite to traffic" the person has
            committed a misdemeanor or felony.  (Italics
19          added.)  Although Vehicle Code section 2800.4
            requires driving in the direction opposite to
20          traffic at some point during the flight, the
            wrong-way driving need not be coextensive
21          with the entire duration of the flight; in
            other words, the element of willfully driving
22          in the wrong direction may occur any time
            during the act of willfully fleeing a
23          pursuing peace officer.  Appellant cannot
            avoid the enhancement by attempting to
24          temporally segment his willful evasion into
            the crime of violating Vehicle Code sections
25          2800.1 and 2800.4.  Here, appellant injured

26  _____

27  [4] California Penal Code section 12022.7, subdivision (a) provides a
    sentencing enhancement for "[a]ny person who personally inflicts
28  great bodily injury on any person other than an accomplice in the
    commission of a felony or attempted felony."

United States District Court
Northern District of California

Broadway while fleeing from a pursuing officer and/or attempting to evade that officer; during that same evasion appellant later drove in the wrong direction. That appellant had not completed the crime prohibited by Vehicle Code section 2800.4 by driving in the direction opposite to traffic when he struck Broadway does not alter our conclusion.  Section 12022.7 applies because appellant was engaged in the commission of the felony when he inflicted the great bodily injury.  (<u>See</u> <u>People v. Gomez</u> (2008) 43 Cal. 4th 249, 254, 74 Cal. Rptr. 3d 123, 179 P.3d 917 [in a continuing offense "no artificial parsing is required as to the precise moment or order in which the elements are satisfied"] ; <u>see also</u> <u>People v. Mixon</u> (1990) 225 Cal. App. 3d 1471, 1488, 275 Cal. Rptr. 817 [section 12022.7 applied where victim sustained injuries after the burglary].)

Our conclusion finds support in cases broadly construing identical language in section 12022.3, subdivision (a), which imposes a sentencing enhancement for the use of a deadly weapon "in the commission" of specified sex crimes.  (<u>See</u> <u>People v. Jones</u> (2001) 25 Cal. 4th 98, 107–108, 104 Cal. Rptr. 2d 753, 18 P.3d 674 [use of a weapon after a series of sex crimes can be "found to have occurred 'in the commission of' " the crimes under section 12022.3, subd. (a) ]; <u>People v. Masbruch</u> (1996) 13 Cal. 4th 1001, 1006, 55 Cal. Rptr. 2d 760, 920 P.2d 705 [section 12022.3, subd. (a) enhancement upheld where the defendant displayed the handgun before the rape]; <u>People v. Castro</u> (1994) 27 Cal. App. 4th 578, 586, 32 Cal. Rptr. 2d 529 [broadly construing phrase " 'in the commission of' " in statutes providing enhancement for use of a weapon in the commission of a crime].)  Appellant has not articulated a persuasive reason why we should interpret "in the commission of" in section 12022.7, subdivision (a) narrowly where numerous courts have given identical language in similar statutes an "'expansive, not a tailored meaning.'"  (<u>People v. Calles</u> (2012) 209 Cal. App. 4th 1200, 1222, 147 Cal. Rptr. 3d 673, quoting <u>People v. Frausto</u> (2009) 180 Cal. App. 4th 890, 900, 103 Cal. Rptr. 3d 231 and distinguishing <u>People v. Valdez</u> (2010) 189 Cal. App. 4th 82, 116 Cal. Rptr.3 d 670 (<u>Valdez</u>).)

Appellant relies on <u>Valdez</u>, which considered

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> when a great bodily injury enhancement may
> attach to the crime of fleeing the scene of
> an injury accident in violation of Vehicle
> Code section 20001, subdivision (a).
> (Valdez, supra, 189 Cal. App. 4th at p. 84,
> 116 Cal. Rptr.3d 670.)  The Valdez court
> determined the "criminal act" prohibited by
> Vehicle Code section 20001, subdivision (a)
> is defendant's flight from the scene of the
> accident and that the injuries sustained in
> the car accident preceding the defendant's
> flight "were not inflicted in the commission
> of a felony or attempted felony based upon
> defendant's subsequent flight." (Valdez,
> supra, 189 Cal. App. 4th at p. 90, 116 Cal.
> Rptr. 3d 670.)  As the Valdez court
> explained, "the purpose of section 20001,
> subdivision (a) is to 'punish not the
> "hitting" but the "running."'  [Citation.]
> The injuries were 'caused by acts which
> occurred prior to the criminal act, not as a
> result of the criminal act.'  [Citation.]
> The fact that defendant subsequently fled
> does not retroactively alter the character of
> the accident from noncriminal to criminal."
> (Id. at p. 90, 116 Cal. Rptr. 3d 670, fn.
> omitted.)  Valdez concerned a different
> Vehicle Code statute and we decline to apply
> its reasoning here.  In Valdez, the
> enhancement could not be attached to the
> crime of fleeing the accident scene
> prohibited by Vehicle Code section 20001,
> because the injury occurred before the
> flight; here, and in contrast to Valdez, the
> injury occurred during the flight that is the
> subject of Vehicle Code section 2800.4.
>
> We conclude the evidence establishes
> appellant inflicted great bodily injury "in
> the commission" of count 4 within the meaning
> of section 12022.7, subdivision (a).

Canela, 224 Cal. App. 4th at 709-10; Ex. C at 18-20.

     The state court in the published opinion found that

Petitioner's actions were sufficient to have personally inflicted

great bodily injury while evading a police officer and driving in

the opposite direction of traffic.  Petitioner disagrees with

this interpretation of state law.  Yet, "a state court's

interpretation of state law, including one announced on direct

appeal of the challenged conviction, binds a federal court sitting in habeas corpus." <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005).  It is undisputed that Petitioner was driving the car, was attempting to evade police after a robbery, and struck the victim causing great bodily harm.  Therefore, there was sufficient evidence to support the state court's finding of great bodily harm and Petitioner is not entitled to federal habeas relief on this claim.

V

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Further, a Certificate of Appealability is DENIED.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals for the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

1    The Clerk is directed to enter Judgment in favor of

2  Respondent and against Petitioner, terminate any pending motions

3  as moot and close the file.

4    IT IS SO ORDERED.

5  Dated: 01/06/2016

6                                    _____

7                                    THELTON E. HENDERSON
                                     United States District Judge
8  G:\PRO-SE\TEH\HC.15\Canela0398.hc.docx

United States District Court
Northern District of California

29